IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL JON FRAZER,<br><br>Defendant. | Case No. CR12-3044<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I.   INTRODUCTION ................................. 1

II.  PROCEDURAL HISTORY .......................... 2

III. RELEVANT FACTS ............................... 2

IV.  DISCUSSION ................................... 7
     A.   Was Defendant's Seizure in the Parking Lot Lawful? ........... 7
     B.   Was the Search of Defendant's Car Lawful? ................. 10

V.   RECOMMENDATION .............................. 14

## I. INTRODUCTION

On the 31st day of October 2012, this matter came on for hearing on the Motion to Suppress Evidence (docket number 15) filed by the Defendant on October 22, 2012, and the Amendment to Motion to Suppress Evidence (docket number 18) filed by the Defendant on October 30, 2012. The Government was represented by Assistant United States Attorney John H. Lammers. Defendant Michael Jon Frazer appeared in court and was represented by his attorney, David Nadler.

## II. PROCEDURAL HISTORY

On September 18, 2012, Defendant Michael Jon Frazer was charged by Indictment with conspiracy to distribute methamphetamine (Count 1) and possession with intent to distribute methamphetamine (Count 2). Defendant pleaded not guilty and trial was scheduled for November 26, 2012. Following a hearing, Defendant was ordered released pending trial.

On October 22, 2012, Defendant timely filed the instant motion to suppress. The Government filed a resistance on October 17. Because of the pending motion to suppress, the trial was continued to January 2, 2013.

## III. RELEVANT FACTS

In the early morning hours of August 16, 2012, Lieutenant Matt Klunder of the Cerro Gordo County Sheriff's Office was on routine patrol in Mason City, Iowa. When Klunder pulled into a convenience store parking lot to wash his windshield, he noticed Defendant and Randy Axiotis in the parking lot of Burke's Bar, located nearby. It was approximately 1:45 a.m., the bar was not closed, and there were several people standing outside drinking in an area designated for that purpose. According to Klunder, Defendant and Axiotis saw him at the convenience store and "kind of stopped what they were doing to watch what I was doing."

Lt. Klunder testified he had information that both Defendant and Axiotis were involved in the distribution of methamphetamine. During the evening of August 14 (less than two days prior to these events), Klunder was reading text messages from Thomas Eckholt, obtained pursuant to a search warrant. According to Klunder, the text messages from several different people, including Defendant, involved drug transactions. In at least one of the messages, Eckholt and Defendant talked about meeting in the parking lot of Burke's Bar. Klunder was also familiar with Axiotis. Klunder testified he had known Axiotis "almost my entire law enforcement career," and had specific information that

Axiotis recently "middled" a meth deal approximately three blocks away from Burke's Bar.

Based on this information, Lt. Klunder decided to "loop" around several blocks and park in the dark one block west of the bar to observe the activities in the parking lot. For 30 to 45 minutes, Klunder watched through binoculars the activity around Defendant and his vehicle. Klunder observed Robert Ristau drive up, get out of his car, and talk with Defendant and Axiotis. Axiotis then left with Ristau in Ristau's vehicle. Ristau was there for less than one minute. According to Klunder, Ristau is also involved in the buying and selling of methamphetamine. Information regarding Ristau was also on the text messages obtained from Eckholt's phone.

At that point, Defendant got into his vehicle. Brianna Sabby came over to the vehicle and got in on the passenger side. According to Lt. Klunder, Sabby has been investigated "a few different times" and authorities had "received information about her being involved in larger scale meth trafficking."[1] Proffered testimony to federal authorities identified Sabbe as selling methamphetamine. Sabbe remained in Defendant's vehicle for a minute or two, and then walked over to another group of people in the parking lot. One of the people she met with was Adam Ramon, who according to Klunder is also involved in methamphetamine trafficking.

At some point, Defendant got out of his vehicle and walked around the back of the Burke's Bar parking lot, where he was out of Lt. Klunder's sight. Klunder estimated that he couldn't see Defendant for approximately 15 seconds. Klunder surmised that Defendant may have transacted a drug deal, and opined that he did not have enough time to "relieve himself." Klunder never saw Defendant enter the bar.

Within a few minutes after Defendant returned from going behind the bar, Lt. Klunder observed Jennifer Ramon walk up to Defendant's vehicle and get in.

---

[1] Until Klunder was promoted to lieutenant in July 2012, he had been assigned to the North Central Iowa Narcotics Task Force for the prior seven years.

3

According to Klunder, authorities have known of Ramon's involvement in meth activity for several years. A proffer given to federal authorities indicated she was "middling meth deals" to several different people. Klunder testified that authorities have text messages showing her involvement in selling methamphetamine on numerous occasions. Within two weeks prior to this incident, a search warrant was executed at her residence – based on a federal fugitive hiding there – and meth paraphernalia was found.

As Jennifer Ramon was sitting in Defendant's vehicle, two females rode up on bicycles. Lt. Klunder recognized one of them as Keri Funk, although he does not know the identity of the other. Klunder estimated the time at approximately 2:15 a.m. Authorities had proffered information that Funk was involved in selling large quantities of methamphetamine in Mason City. Text messages also showed her involvement. When Klunder questioned Funk earlier in the year about her drug activity, she did not deny her involvement, but denied the quantity of drugs attributed to her.

According to Lt. Klunder, when the two women arrived at Defendant's car, the second woman took off her backpack and held it below window level "basically to shelter anybody from seeing what was going on was what it looked like to me." After less than a minute, the woman put her backpack on and she and Funk left the area on their bicycles.

A minute or two after the women left, a silver vehicle pulled up in the alley approximately 10-15 yards away from Defendant's vehicle. Jennifer Ramon got out of Defendant's vehicle, walked over to the silver vehicle, and leaned in the passenger window. After talking to the occupants for "a very short period of time," Ramon walked back to Defendant's vehicle, got in for a few seconds, and then got back out. Ramon then walked back to the silver vehicle, leaned in the passenger window again for a few seconds, and the silver vehicle then drove away. Ramon then returned to Defendant's vehicle. At some point, Ramon then returned to the area of the parking lot "where everybody else was kind of standing around."

Shortly after starting his surveillance, Lt. Klunder accessed the county's database and searched under Defendant's name. A vehicle matching the description of the car used by Defendant that night – a 1985 Chevrolet Caprice – was shown as "associated" with Defendant. Klunder then accessed the state database, which indicated that the vehicle was registered to Defendant and noted that the registration expired in June. Klunder admitted that the state database also stated that the plate had been "removed" from the vehicle, although Klunder testified that he did not see that notification until later.

After Defendant left the parking lot at Burke's Bar, Lt. Klunder decided to conduct a vehicle stop, based on his belief that the registration had expired two months earlier. When Defendant pulled into a nearby convenience store, Klunder pulled up behind him and activated his lights. Defendant started getting out of his vehicle, but Klunder ordered him to stay in the car. According to Klunder, he "didn't want him to run" and there was also an "officer safety issue." Once Klunder was up to the car, however, he told Defendant to step out. According to Klunder, Defendant was initially noncompliant with "what I was telling him to do," and Klunder "pulled my taser out" to encourage compliance.

Lt. Klunder advised Defendant that he had been stopped for an expired license plate. Defendant told Klunder that his license plates were not expired. Klunder waited for a back-up officer to arrive and then went back to his vehicle to check the plate again. At that time, Klunder ran the number on the license plate that was actually on the vehicle. Klunder learned that the vehicle was registered in the name of Stacy Swieter, and the license and registration were valid.

Stacy Swieter testified at the instant hearing that she is Defendant's fiancé. On August 7, 2012, just nine days prior to these events, title to the vehicle was transferred from Defendant to Swieter.[2] According to Lt. Klunder, when he was conducting surveillance of the vehicle it was parked at an angle to him and he could not read the

---

[2] A copy of the certificate of title was introduced as Defendant's Exhibit B.

license plate. Klunder admitted that he could have seen the license plate when he pulled behind Defendant at the convenience store, but he "didn't even look at it."

While Lt. Klunder was verifying the registration on the vehicle and talking to Defendant, Deputy Russell Jensen, who had arrived to assist Klunder, looked into Defendant's vehicle using a flashlight. Jensen told Klunder that he observed "a bunch of money sitting on the seat." Klunder also observed the money from outside the vehicle. A photograph showing a substantial amount of loose money on the seat of the vehicle was introduced as Government's Exhibit 1. Klunder testified that $799 was found on the seat.

Defendant's sister, Michelle Collings, also testified at the hearing. During the evening preceding these early-morning events, Collings and her boyfriend went for a drink at the Sportsman's Bar in Mason City. Sportsman's closes early, however, and they proceeded to Burke's Bar, arriving around 1:30 a.m. According to Collings, there was a birthday party for Brianna Sabby and Jennifer Ramon. Collings testified that "I sat there and talked to the girls and there was a whole bunch of people that I knew there, so I started talking to them and someone mentioned that my brother was outside, so I went outside to see my brother." Collings estimated that she got into Defendant's car around 1:40 or 1:45 a.m. At that time, there was "nothing on the seats." Collings and Defendant talked and listened to music, and Collings remembered Sabby coming to the car to ask Defendant if he was going to give her a ride home. After 10 or 15 minutes, Collings left the car and returned to the area where people had gathered outside the bar. Collings could not remember seeing Jennifer Ramon go to the car, but did observe people approach on a bicycle. Collings did not remember if one of them had a backpack, and could not hear what was being said. Collings did not observe anything which looked like a drug transaction.

Ms. Collings testified that she had left by the time Defendant was stopped by Lt. Klunder. Collings also testified, however, that she saw the police car at the nearby convenience store. Collings started to say that she was able to identify it as a sheriff's

vehicle because of "the big star," but then admitted that "I can't remember what it had on it, to tell you the truth." Collings confirmed that she was able to identify it as a law enforcement vehicle, however, and that it attracted her attention. On cross-examination, Collings confirmed that she was not there when Defendant was getting pulled over. According to Collings, she found out later that she left about 20 minutes prior to Defendant being approached in the convenience store parking lot.

## IV. DISCUSSION

In his initial motion to suppress, Defendant argues that Lt. Klunder lacked reasonable suspicion to stop him in the convenience store parking lot. In his amendment to the motion to suppress, Defendant asserts that officers lacked probable cause to search his vehicle.

### A. Was Defendant's Seizure in the Parking Lot Lawful?

Initially, it should be noted that Defendant was not "pulled over" by Lt. Klunder. Rather, Klunder pulled in behind Defendant as he stopped at a convenience store. The Fourth Amendment is not implicated by a law enforcement officer simply approaching a parked vehicle and asking questions of the occupants. *United States v. Berry*, 394 F.3d 1070, 1075 (8th Cir. 2005). In this case, however, Klunder did not merely approach the car and ask Defendant to respond to questions. Rather, he activated his red lights, blocked Defendant's exit, directed Defendant's movements, and threatened the use of a taser if Defendant was noncompliant. The Government concedes that Defendant was "seized" for Fourth Amendment purposes when confronted by Klunder in the parking lot.

To justify an investigative stop, an officer must have a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Here, Lt. Klunder mistakenly believed that the vehicle being driven by Defendant had expired license plates. Defendant notes that the license plates on the vehicle were not, in fact, expired, and argues that the stop was based on Klunder's "mere hunch" that Defendant had engaged in drug trafficking while in the parking lot at Burke's Bar.

7

The Eighth Circuit Court of Appeals recently addressed the validity of a traffic stop based on an officer's mistaken belief that a traffic violation had occurred. In *United States v. Hollins*, 685 F.3d 703 (8th Cir. 2012), officers stopped a vehicle because it lacked any license plate. As he approached the vehicle, however, an officer saw what appeared to be a valid "In Transit" sticker, although he did not then verify its expiration date. *Id.* at 705. It was later determined that the in transit sticker was valid. The defendant argued that even if the officer was reasonably mistaken in believing there was a traffic violation, any reasonable suspicion vanished when the officer saw the in transit sticker. *Id.* In affirming the defendant's conviction, the Court succinctly summarized the law regarding vehicle stops and mistakes of law or fact.

> The Fourth Amendment prohibits "unreasonable searches and seizures." "A traffic stop constitutes a seizure of a vehicle's occupants, including any passengers." A traffic stop "must be supported by reasonable suspicion or probable cause." "The determination of whether probable cause," or reasonable suspicion, "existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop. Mistakes of law or fact, if objectively reasonable, may still justify a valid stop.

*Hollins*, 685 F.3d at 705-06. (internal citations omitted)

Here, Lt. Klunder checked the county database while conducting surveillance on Defendant and determined that a vehicle matching the description of the car was "associated" with Defendant. Klunder then accessed the state database, which indicated that the vehicle registration had expired two months earlier. The state database also stated that the plate had been "removed" from the vehicle. While Klunder testified that he did not see that notification until later, he provided no explanation as to why a reasonably diligent officer would not have noted it initially. In any event, when Klunder rolled up

8

behind Defendant's vehicle in the convenience store parking lot, he was under the mistaken belief that the vehicle registration had expired.

Although Lt. Klunder was unable to read the license plate from the location where his surveillance was conducted, he made no effort to check the license plate before approaching Defendant in the convenience store parking lot. Klunder admits that the license plate was plainly visible at that time, and the video of the stop demonstrates that he later quickly confirmed that the license plate was valid.[3] Accordingly, when Klunder approached Defendant and ordered him out of the vehicle, he remained under the mistaken belief that the vehicle was not properly registered.

As noted by the Court in *Hollins*, a mistake of fact, if objectively reasonable, may still justify a valid stop. *Id.* at 706. *See also United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) ("[I]n mistake cases the question is simply whether the mistake, whether of law or fact, was an objectively reasonable one."). Accordingly, the Court must first consider whether Lt. Klunder's mistake of fact was objectively reasonable.

Lt. Klunder reasonably should have known that the state database included information that the license plate had been "removed" from the vehicle. Klunder provided no explanation as to why he failed to note that initially. That conclusion does not, however, end the Court's analysis. *If* Klunder had seen the notation that the license plate had been removed, it would have justified further investigation. That is, because Klunder was unable to read the license plate from his vantage point, he would know only that Defendant was driving a vehicle from which the plates had been removed. A review of the video reflects that Klunder was unable to read the plate until he rolled up behind Defendant, who was already stopped in the convenience store parking lot. In other words, even if Klunder had noticed the advisory in the state database that the plate had been removed, it would nonetheless have justified an investigatory stop.

---

[3] A DVD of the vehicle stop was introduced as Government's Exhibit 2.

In *United States v. Sanchez*, 572 F.3d 475 (8th Cir. 2009), a trooper stopped a minivan traveling on the interstate when it displayed a "piece of paper" where the rear license plate would have been displayed. Suspecting that the paper was not an official document, the trooper decided to stop the minivan to investigate. As the trooper approached the minivan, he bent down to examine briefly the paper taped to the back. He did not see the words "Arizona Temporary Registration Plate" on the paper. *Id.* at 477. The defendants moved to suppress evidence obtained from a search of the vehicle, arguing that the piece of paper taped to the back of the minivan was a valid Arizona temporary registration plate, and the trooper should have recognized that it was an official document. In affirming the defendants' convictions, the Court concluded that it was objectively reasonable for the trooper to investigate further, even though upon close examination the words "Arizona Temporary Registration Plate" appeared at the bottom of the paper. *Id.* at 479. "Like the officer in *Smart*, [the trooper] stopped a vehicle based on imperfect information, but acted reasonably in doing so." *Id.* Similarly, even if Lt. Klunder had noticed the information that the plate had been removed from the vehicle, reasonable suspicion would nonetheless exist for an investigatory stop. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). Therefore, I believe Defendant's seizure in the convenience store parking lot did not violate the Fourth Amendment.

### B. Was the Search of Defendant's Car Lawful?

Next, the Court addresses the issue of whether the search of Defendant's vehicle was lawful. The Fourth Amendment protects persons against unreasonable searches and seizures. Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the

10

vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe that there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Rodriguez*, 414 F.3d 837, 843 (8th Cir. 2005). Probable cause "is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States Colbert*, 605 F.3d 573, 577 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1984)). The Government bears the burden of establishing that the exception applies here. *Kennedy*, 427 F.3d at 1140.

Here, Lt. Klunder observed Defendant sit in his car in the parking lot at Burke's Bar for approximately 45 minutes during the early morning hours of August 16. During that time, Defendant did not go into the bar, nor did he approach persons who were apparently drinking outside the bar in an area designated for that purpose. Rather, Defendant sat in his car, where he was visited for short periods of time by numerous individuals. Klunder had proffered information that Defendant was involved in drug trafficking, and Klunder had recently read text messages suggesting that a drug transaction may occur at Burke's Bar.

At one point, Lt. Klunder observed two women ride up to Defendant's vehicle on bicycles. Authorities had proffered information that one of the women was involved in selling large quantities of methamphetamine in Mason City. Text messages also showed her involvement, and when Klunder questioned her earlier in the year about her drug activity, she did not deny her involvement. Klunder observed the other woman take off her backpack, hold it below window level as if to shelter it from view, and then put it back on. The two women on bicycles stayed only a short time. Even more suspiciously, a silver vehicle stopped nearby in the alley. Jennifer Ramon, who was known to authorities as "middling in meth deals," got out of Defendant's vehicle, walked over to the silver vehicle and leaned in the passenger window, talked to the occupants for a very short period

of time, walked back to Defendant's vehicle, got in for a few seconds, got back out and walked to the silver vehicle, leaned in the passenger window for a few seconds, and the silver vehicle then drove away.

After Defendant's vehicle was approached in the convenience store parking lot, Deputy Jensen and Lt. Klunder observed a large amount of cash sitting on the front seat. A review of the video suggests that some of that money may have been removed by Defendant from his pockets after he was ordered out of the vehicle. That is, the video shows Defendant reached in each of his front pockets and threw something into the open door of the vehicle. The amount shown in the photograph introduced as Exhibit 1, however, exceeds the amount which Defendant may have taken from his pockets. Even if a portion of the cash depicted in Government's Exhibit 1 reflects amounts which otherwise would have been found in Defendant's pockets, it nonetheless demonstrated to the officers prior to the search that Defendant was in possession of a large amount of cash. The Court is mindful that Exhibit 1 may not reflect precisely what the officers saw prior to the search. Defendant's Exhibit D shows a different depiction of the front seat, and Klunder acknowledged that he was not sure of the "time line" regarding the taking of the photographs. Nonetheless, the Court finds credible Klunder's testimony that he and Jensen observed "a bunch of money sitting on the seat" prior to the search.

The Court has not disregarded the testimony of Defendant's sister, Michelle Collings. In attempting to reconcile the testimony, however, it would appear that Collings' interaction with her brother occurred prior to Klunder's observations. That is, Collings apparently observed Klunder when he initially stopped at the convenience store to wash his windshield. By her account, however, Collings got out of Defendant's vehicle, socialized with other persons in the area, and then left the bar about 20 minutes prior to Defendant being stopped in the convenience store parking lot. That is, many of the observations made by Lt. Klunder apparently occurred either while Collings was socializing inside or outside the bar, or after she had left the area.

In determining whether probable cause exists, the Court recognizes that officers possess specialized law enforcement experience and thus may "draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous." *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (quoting *United States v. Caves*, 890 F.2d 87, 94 (8th Cir. 1989)). Before he was promoted to lieutenant one month prior to these events, Lt. Klunder had been assigned to the North Central Iowa Task Force for seven years. Klunder estimated that he had been involved in at least "a few hundred" methamphetamine investigations. Klunder testified that he had been involved in a substantial number of investigations with controlled buys, and had watched drug transactions occur. In determining whether the totality of the circumstances established probable cause, the Court must view the facts through the eyes of an experienced narcotics agent. *Id.*

In considering the totality of the circumstances, the Court concludes that there were "sufficient facts to lead a prudent person to believe that there [was] a 'fair probability that contraband or evidence of a crime'" would be found in Defendant's vehicle. *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)). Lt. Klunder had information regarding Defendant's involvement in drug trafficking, and had recently reviewed text messages obtained pursuant to a search warrant suggesting a drug transaction involving Defendant may occur in the parking lot of Burke's Bar. Klunder then observed a number of persons believed to be involved in drug trafficking approach Defendant's vehicle. Although he was unable to see drugs exchanged from his vantage point, Klunder saw at least two interactions which, based on his experience, strongly resembled drug deals. Prior to the search, Klunder was also aware that Defendant was in possession of a number of wads of cash. Because there was probable cause to believe that contraband or evidence of a crime could be found in Defendant's vehicle, a warrantless search was authorized under the "automobile exception."

## V. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that Defendant's Motion to Suppress Evidence (docket number 15), as amended (docket number 18), be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on October 31, 2012.*

DATED this 15th day of November, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA